THE COMMERCIAL BANK OF ALBANY *v.* TUCKER.

1. The declaration alleging that the plaintiff loaned money to the defendant, and also that money was advanced by the plaintiff to the defendant upon the promise and undertaking of the latter that he would turn over and deliver to the former drafts drawn by a company of which the defendant was treasurer, is not supported by evidence that the money was not loaned or advanced to the defendant but to such company, together with evidence that the defendant did contract and undertake as alleged to turn over and deliver the drafts.

2. But inasmuch as the case established by the evidence seems to be meritorious, while the judgment of nonsuit is affirmed, direction is given that the plaintiff have leave to amend the declaration at or before the time when the *remittitur* from this court is entered on the minutes of the court below, so as to make the pleading and the evidence correspond, and that upon this being done, the case be reinstated and stand for trial in its proper order.

August 14, 1894.

Complaint.    Before Judge BOWER.    Dougherty superior court.    October term, 1893.

The bank brought suit against A. W. Tucker upon three drafts.    The court granted a nonsuit on the ground that plaintiff's evidence did not make out its case.    The drafts are in the form of ordinary bank-checks, drawn on the plaintiff, July 7, 8 and 9, 1890.    The first, for $2,000, is payable to "H. & T. or bearer"; the second, for $184.26, is payable to John F. Lewis & Son or bearer; the third, for $600, is payable to Hobbs & Tucker or bearer.    The first is signed, "Ga. & Carolina Melon Exchange, A. W. Tucker, treas'r"; the other two are signed, "Georgia & Carolina Melon Exchange, per A. W. Tucker, treasurer."    The original declaration alleges: Plaintiff paid said drafts, not because of any indebtedness or liability on its part, but simply as a matter of accommodation to defendant, who undertook and promised, on his own personal and individual responsibility, that if plaintiff would cash said drafts, he would within two or three days place with plaintiff drafts on consignees of car-loads of melons, which would be paid to plaintiff on presentation and which would be amply sufficient to cover the amount of the drafts so paid by it.    Defendant represented to and assured plaintiff that the melons had been shipped and the drafts drawn by the Georgia & Carolina Melon Exchange against the consignees of the melons, that the drafts would come in two or three days or other short time, and that defendant would turn the same over to plaintiff to indemnify and repay it for the money so advanced by it.    Within the next two or three days the Georgia & Carolina Melon Exchange suspended and failed for a large amount, and defendant never did turn over the promised drafts to plaintiff, nor repay it the amount paid out on said drafts, although he well knew the failing condition of the exchange when he borrowed said money of plain-

tiff. Said drafts were paid by plaintiff on the faith of the responsibility of defendant, who undertook and promised to turn over to plaintiff drafts to a sufficient amount to pay the sums so advanced by plaintiff, which he failed to do, whereby he became liable and then and there undertook and promised to pay plaintiff said sum of $2,784.26. By amendment it is alleged that defendant is indebted to plaintiff in the sum named, as so much money advanced, for that, when he presented said three drafts to the bank and asked it as a matter of accommodation to him to cash them (there being no funds in the bank to pay them, and no liability on the bank to pay them), the bank refused to advance the money unless he would become personally responsible therefor; whereupon he then and there undertook and promised that he would be personally and individually responsible for the delivery to plaintiff of the promised melon drafts; and thereupon plaintiff, in consideration and upon the faith of defendant's personal and individual promise and undertaking, advanced said sum to him; and he, having failed to deliver said melon drafts, became liable to pay plaintiff said sum, with interest, under his personal and individual promise and undertaking, upon which and on account of the breach thereof this suit is brought.

Welch, cashier of the plaintiff bank, testified: The $2,000 draft was sent to the bank by a messenger. I declined to cash it, and defendant himself came down to get the money, stating that it was very important for him to have $2,000 for some special purpose, and stated that he had a dispatch from Forrester, the president of the melon exchange, that the drafts for shipments of melons would be down on the next train, or very soon, as the melons had all gone forward and were paid for, and this was to reimburse him and the melon exchange for them, and would be turned over he thought by the incoming train. Under these conditions, and un-

der the assurances of defendant that those drafts for shipments of melons would be turned over immediately, I paid the $2,000 draft. The others were paid in a similar way, with the promise that they should be paid by drafts. He had been doing this for some time, getting advances against a deposit or bonus he had to protect the drafts, getting the money one day and returning us the drafts the next day for shipments of melons. Immediately after the train came in that afternoon, I went to defendant to get the drafts for the shipment of melons; and he said, for some reason they did not come but would probably be in that night, and assured me again of the dispatch from Forrester that the melons had been shipped and the drafts would come right forward. The melon exchange made a deposit with the bank of $7,500 to cover any drafts that might go forward and come back protested or unpaid. When these drafts came back unpaid, as they often did, I immediately presented them to defendant, and he made good that amount. This bonus was put there to protect the bank against any failure of payment on these melon drafts that went forward. We had been in the habit of advancing him two, three, and sometimes four thousand dollars to aid him in paying for the melons until he got his drafts back from Atlanta. The melons had to go to Atlanta to be listed, and drawn for specifically by cars. They were paid for here, and the drafts drawn against the consignee of these melons were drawn in Atlanta and forwarded back here and turned over to us. That $7,500 was not sufficient to meet these drafts after meeting others before them that had failed; it was exhausted by other drafts that came back. That money was paid upon the faith of defendant to return the drafts. He assured me that they would be returned, and gave me as an additional reason the dispatch he had from Forrester that the melons had been shipped. He assured

me that they would come. On the strength of that assurance I paid the draft, and without it I should not have paid it. At that time I had no knowledge but that the melon exchange was all right, but by that afternoon's mail I learned that it was in bad condition. I called on defendant for the drafts that afternoon and the next morning. He did not give them to me, but gave as an excuse that they had not come and he was looking for them. They were never turned over to me. They were drafts drawn on melon shipments, such as we had been taking; they were supposed to be merchantable paper. Similar advances had been made frequently, and he had made them good when they had failed. He was the treasurer of the melon exchange. He dealt with me as treasurer of the exchange. The bonus they had on deposit was used up in unpaid drafts that came back both before and after; many of the drafts were out, and it took some time for them to come back. It would be impossible to tell how much cash the melon exchange had in bank on July 8, because that bonus was there to protect certain drafts that were out. I do not think the bonus was exhausted at that time, because many of the drafts were not returned; it was really exhausted, but we had not got the information showing it. I did not take drafts drawn by the melon exchange after I heard it was in bad condition on the evening of the 7th. I think we took no drafts after the failure; we did take some bills of lading for some cars of melons that defendant said were shipped and not drawn against. I let him have this money as treasurer of the melon exchange, and charged it to him that way; but took his word as a business man and a friend that these drafts should come in promptly. I told him that I was looking to him personally for the return of them, and not as treasurer of the exchange. I told him that at the bank. My impression is that Armstrong, the

book-keeper, was in the bank. Carter (the president), Ticknor (the assistant cashier) and I had a conversation with defendant, that it was a matter of trust to him individually that these drafts should come promptly back to us. We did not hold him responsible for the payment of the drafts, but for the return of the ones promised us—melon drafts for melons shipped. I cannot name any particular draft that Forrester was to send to defendant and he turn over to me, because I could not tell who those drafts would be on. If defendant had delivered those drafts, there would have been no liability on him, as I understand it; he would have fulfilled his personal obligation. He may have said something about not assuming personal obligation; but he will also remember that when he got this money, he was to deliver the drafts for shipments of melons when he got them from Forrester. The discount on those drafts was charged to the melon exchange; there was a little extra charge on those drafts, because they were frequently out a week or ten days. The agreement was made with defendant as treasurer of the melon exchange, and Forrester too. The amount we advanced on these drafts was charged on the books to the melon exchange. After the exchange failed, defendant, I think, turned over the bills of lading for nine cars of melons which he said there had been no drafts drawn against; and at his and Forrester's suggestion we forwarded these bills of lading to their agent in Atlanta, and ordered them sold for the benefit of the bank; and we never got any return from them at all—never heard from them. I think that was the next day after the transaction, the 8th or 9th. Defendant assumed the personal responsibility to turn over these drafts for shipments of melons. They were to be the same kind of drafts we had been taking—drafts against melons already shipped. That money went out of the bank on the individual responsibility of defendant

that these drafts for shipments of melons should be turned over to me, and on his individual liability in the event they were not delivered to me, and that individual liability was only for the delivery of those drafts. I told him so. My reliance was not on the exchange for the drafts coming on. His was a positive promise that the melons had been shipped and the drafts would be turned over. The drafts were not delivered. If he had delivered me the drafts from Forrester, I would have had no claim on him at all. He did not tell me that Forrester told him he had the drafts and would send them; he said he had a telegram from Forrester, and the drafts would come on. He said the melons had been shipped. When he spoke of what Forrester had telegraphed him, I told him right then that I looked to him personally for the delivery of the drafts. Previously to this, when it was understood we were to make these advances, Carter and I told defendant that we looked to him in person for the delivery of these drafts. On August 9, the melon exchange did not have $2,500 besides the bonus to its credit. There was a little money that came back from Falvey & Forrester after the failure of the exchange, either the consignment of this nine cars, or some drafts that had come back and been protested, drawn prior to this transaction. I do not think any of it came from the nine cars of melons, but from certain drafts that came back unpaid; perhaps $150 was traced up in that way. We did not keep on dealing with Forrester, the president of the melon exchange; we were tracing up the proceeds of some drafts that came back unpaid and went into the Atlanta Melon Exchange, and we made a claim for it and got it. There were seven or eight thousand dollars in amount of these drafts for shipments of melons, outstanding and unpaid at the time of the failure. That amount was put to the credit of these former unpaid drafts. On July 7, any amount the melon

exchange had put in the bank as a bonus was absorbed by drafts then in transit; the drafts that had been taken previous to that, when they came back unpaid, more than absorbed the bonus. There was no order, that I know of, in which this bonus was to be appropriated to these unpaid drafts. When a draft came back, this bonus could be applied to the payment of it; and up to the time of this transaction, or the day before, all drafts returned had been made good by Tucker by giving other drafts to keep that bonus good. The drafts outstanding then were more than sufficient to absorb the bonus. The transaction between defendant and myself had no reference to the bonus. If the melon exchange had had a bonus of $25,000 put there for a specific purpose, it would have been kept for that purpose. If he had had $7,500 with us on the day he gave this draft, and it came back unpaid, I would have charged it up against the bonus. It was an agreement we kept to until a short time before this, that this $7,500 was to be kept intact; and when a draft came unpaid, I went immediately to defendant, and he immediately gave me drafts to take that up, and not disturb the $7,500. He as treasurer had no right to check on that bonus. In letting him have that money I relied upon his individual promise both as a business man and a friend. The telegram he mentioned from Forrester had nothing to do with the matter. I relied upon defendant.

Ticknor testified: The original arrangement with defendant was, that we were to advance a certain per cent. against the drafts drawn with bills of lading attached, provided he kept a bonus of $7,500 in our hands; but the distinct understanding was, that we were not to advance a cent unless the $7,500 was kept there. I left here about July 1, and returned August 5. The day before I left I went to see defendant and told him that the bonus must be kept as a bonus, or we could do no

business at all; he said, wait until he could hear from Forrester. I repeated the conversation to Welch. For instance, if he gave us a draft for a car-load of melons, and it suited us, we would advance him fifty per cent.; that is the original arrangement as to how we should conduct this business. However, for this charge of $2,700 we had no drafts in hand. Our responsibility was with the melon exchange company. I asked defendant if Hobbs & Tucker would be responsible for these drafts, and in that case we would not require any bonus. I had no conversation with defendant about his responsibility for delivering the drafts; we never expected to advance a dollar without the drafts in hand. I had a conversation with him after my return; he came to my office after I got back, to talk the matter over; he was afraid I would think he had done something that was not exactly right; and I asked him the question, why did he get the money from us, when I had every reason to believe he knew the thing had failed before he got the money, and why did he get the money from us under these conditions; and he said, "To tell you the truth, I had too much money in this business, and had to get some out. I had to recoup myself." When he traded those drafts, I do not think there was a cent of the bonus there. I think that money had all been drawn out. I am not positive, but am quite sure, that he knew he was not drawing against the bonus money. I suppose he was drawing against the promise to furnish these drafts; that is what I gathered; all that I know is that there was nothing in hand to be drawn against, except the expectation of being replaced by melon drafts. Two or three days before the failure of the exchange, he had instructions not to buy any more melons (so he told me). I will not state positively how much of the bonus was on hand when I left. There was nothing on hand when this transaction took place, but might have been in round

numbers about half the amount which the bonus should have been when I left. I did not like to leave here with this bonus impaired, and asked Welch to see defendant, but he was busy and did not go; he did not attach the importance to it that I did. When I left here, there was a credit to the exchange of $10,695; on July 7, there was a credit of $5,103.53. The $2,000 item seems to have been paid on the 8th; on the 8th I find a balance of $5,205.20, and on the 9th, $3,765.34; that is, from eight to ten thousand dollars in these drafts that were gone forward, drawn principally against the stockholders of this concern and returned unpaid; and they are credited up here as cash, and were nothing but worthless drafts on stockholders. I know they were stockholders, because we had a list of them furnished us when they first started. The largest drafts were all drawn against the stockholders of the concern, with bills of lading attached; and they were houses of high standing, and we did not get anything out of them. After a deduction of those drafts that were returned, they would have owed us $3,000 at that time. These drafts were never charged up against that bonus fund. The indebtedness the melon exchange was under to us when it failed was never paid, and we did not count that anything at all; we only counted what we advanced defendant. The exchange was indebted to us $5,700; $2,700 we claim as good, and the other lost. While this account shows they had a big credit, these drafts were in transit coming back to us, and were charged against this account. Those were the last drafts we got that came back unpaid towards the last of the business; a great many had come back in the last week or ten days. When they came back Hobbs & Tucker made them good. Unfortunately the bonus was not kept separate. The bonus had been exhausted prior to this transaction. The drafts that had been returned up to the

time of this transaction had been taken care of by Hobbs
& Tucker. On July 7, the exchange was credited as
stated, but we had taken drafts as cash and sent them
forward for collection, and had no report on them.
They were coming back every day, but the bulk of them
came back after the transaction with defendant. The
bank had paid the money for them and sent them off to
our correspondents for collection; there was a liability
to us from the exchange until we got final payment for
them. Up to the time of the failure, if one of those
drafts came back unpaid, all we had to do was to pre-
sent it to Hobbs & Tucker, and they would refund the
money, but after the failure they were left on our hands;
and while the account showed an actual credit to the
exchange, it should not have been, because the drafts
were not finally paid. There were enough drafts out
to absorb that fund; on the 9th there were out about
$8,500 of drafts, when their account showed $3,700 to
their credit; in other words, they had out $5,000 more
than they had credit for. If the drafts had got back to
the bank by that time, the exchange would have owed
us $5,700. The responsibility had occurred, but the
drafts had not been charged up. The melon exchange
was due us for the drafts that had been received and
sent off for collection. Defendant drew all the drafts.
The understanding was that we were to advance them a
certain sum on these melon drafts, and we had advanced
them $8,500. At the time of this transaction with de-
fendant the $7,500 had been absorbed by previous drafts.
Nothing was said about the way in which these drafts
were to be paid. Under our original agreement, defend-
ant had no right to draw a check not based on a melon
shipment, on that bonus. I would not have let it touch
that fund; it would have been a separate transaction.
These unpaid drafts charged up on August 9, were turned
over to defendant, and he gave us a check for part of

them; and after this failure came, some of the drafts were drawn on stockholders, and he gave us back those drafts, and we tried to get them out of the stockholders, but could not. These drafts on the stockholders were for cars of melons with bills of lading attached like all the others; they were acting like any other customers. This $8,500 of melon drafts came in about the 7th, 8th and 9th of July; we did not charge them up until they all came in, and then all at one time, and they were in considerably before they were charged up. When the exchange was in existence, Hobbs & Tucker made good to us all these drafts that were in default. There were none in default when defendant made the promise that we claim. This transaction with him was not in the ordinary line of the business, but was an outside matter. I told him I would not advance without the bonus intact; and did not anticipate anything like this. There were some drafts that came in unpaid, returned for some objection, I do not remember what they were, and we would send them to defendant, and he would give us a check on ourselves, and make that good by subsequent deposits. They would deposit melon drafts with bills of lading attached. On July 6, on a settlement between the bank and the exchange, they would have owed us $5,700 if they had made good all the drafts that were not heard from. We sent the drafts forward, and did not know that day that there was a cent due us; our books showed over $3,000 due them. When a draft came back, defendant would swap me a good one for it. He was treasurer of the melon exchange, and the business was carried on by him as treasurer.

Tucker, the president of the bank, testified: Forrester, president of the exchange, came to me and said defendant would need some assistance in handling the melon business, and wanted to know if the bank would assist him in cashing drafts; and said that defendant as

treasurer of the melon exchange would deposit $7,500, this bonus to remain intact, and secure us against any losses for cashing these drafts. They were to indemnify me against any losses. The exact amount I do not remember, but about half was deposited with the bank when I left here the latter part of June. I left with the understanding with Welch, that the bonus should be made up to $7,500 and should be intact. When I came home, a few days after the failure of the melon exchange, their debt to the bank, including the amount advanced defendant, was about $5,600. The bonus was exhausted and Welch had let defendant have a good amount in addition. According to our understanding, we were to cash melon drafts for defendant. I had no understanding with him as to making advancements in the absence of drafts. Very few transactions took place before I left.

WOOTEN & WOOTEN and J. W. WALTERS, for plaintiff.
R. HOBBS, D. H. POPE and W. T. Jones, for defendant.

LUMPKIN, Justice.

The Commercial Bank of Albany brought an action against A. W. Tucker; a nonsuit was granted, and the plaintiff excepted. The substance of the declaration, and of the evidence offered in support of it, appears in the official report.

1. We have given the declaration a very thorough and careful examination. Taking into view all of its allegations, we do not think it can be fairly construed as being either more or less than an action by the bank against Tucker for money loaned or advanced to him upon his promise and undertaking that he would turn over and deliver to the bank drafts drawn by the Georgia and Carolina Melon Exchange, a company of which he was the treasurer. As will be seen by reference to the reporter's statement, the declaration alleges that the

plaintiff paid the drafts "simply as a matter of accommodation to defendant"; that "he well knew the failing condition of the exchange when he borrowed said money of plaintiff"; that "said drafts were paid by plaintiff on the faith of the responsibility of defendant"; and that "he became liable and . . . undertook and promised to pay plaintiff" the sum so advanced. These, and other like expressions in the declaration, bear out, we think, the construction we have placed upon it.

An examination of the evidence will show that it does not support the declaration.   The case made by the proof was, that the money was not loaned or advanced to Tucker individually, but to the company he represented; and although there was evidence that Tucker did contract and undertake, as alleged, to turn over and deliver to the bank drafts drawn by his company on melon shipments, there is a fatal variance between the declaration and the evidence in the vital respect above pointed out.   An averment that money was loaned to an individual, or advanced to him, is not supported by proof that it was loaned to a company for which he was acting.   The two things are necessarily inconsistent.

2. The judgment of nonsuit, for the reasons above stated, was clearly right, and is therefore affirmed.  But we have given direction that the plaintiff may amend his declaration, at or before the time when the *remittitur* from this court is entered in the court below, so as to make the pleading and the evidence correspond; and that upon this being done, the case be reinstated.   Our reason for giving this direction is, that the case made by the evidence seems to be meritorious; and if the plaintiff really is entitled to a recovery, it ought not to be defeated upon mere technical rules, however correct. Without making now any absolutely binding or definite adjudication that the plaintiff is entitled to recover upon the facts proved, we simply rule that the case appears

to be one worthy of further investigation. The trial court may be able, without serious difficulty, to arrive at a just and lawful conclusion when the defendant's side of the case has been brought out by the evidence. Whether or not he is protected by the statute of frauds; or, independently of this question, is for any other reason not liable, can better be determined after the whole case has been developed. *Judgment affirmed, with direction.*